UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIM. NO.  07-20027-01 |
| VERSUS | * | JUDGE MELANCON |
| DANIEL MARTINEZ-MEDINA | * | MAGISTRATE JUDGE HILL |

REPORT AND RECOMMENDATION

The defendant, Daniel Martinez-Medina (Martinez-Medina), has filed a Motion to suppress statements that he made to federal agents on March 8, 2007, on the grounds that the statements attributed to him were not, in fact, made by him and further that the statements made by him were not freely and voluntarily made. [rec. doc.  22]. The government has opposed the motion. [rec. doc. 23]. An evidentiary hearing on the motion was held on May 21, 2007. For those reasons set out below, I recommend that the motion be **denied**.

FACTS

The facts are not really in dispute. On March 7, 2007, United States Border Patrol Agent Daniel Stanley (Stanley) was en route to his residence at approximately 5:00 p.m. in a fully marked (light bar, stripe, Department of Homeland Security emblem) Border Patrol vehicle. Stanley was southbound on Nelson Road, approaching Ham Reid Road, in Calcasieu Parish, when he observed several people running from a residential construction site. Initially, Stanley believed that these were "kids", but, on closer

inspection, believed them to be Hispanic males who were running towards some woods in the area. Stanley also observed two vans at the construction site at which, apparently, the Hispanic males were working. Stanley, because he was alone, decided to try to intercept the two vans the next morning when, presumably, they would be returning to the work site.

The next morning was foggy, and Stanley, because of his concerns about stopping vehicles in foggy conditions, decided to wait to approach the vans at the work site. Stanley drove into the area of the work site about 10:00 a.m., and immediately saw men running away. Some of the men fled in one of three pickup trucks at the site, with Stanley in pursuit. Stanley said that he broke off the pursuit when the pickup approached a busy intersection. At that point, Stanley returned to the work site. When he got back to the site, he met two men whom he identified as Martinez-Medina and Francisco Maya Fajardo (Fajardo).

Stanley, who is fluent in Spanish, began to speak to Martinez-Medina in English. Stanley testified that he always speaks in English first, and then speaks in Spanish if the other person cannot understand English. Stanley asked who the foreman was, and the defendant answered, "I guess I am." The defendant produced a valid Resident Alien Card which identified him as Daniel Martinez-Medina.

Fajardo did not speak English, so Stanley spoke to him in Spanish. Martinez-Medina was present during the entire conversation in Spanish with Fajardo. Stanley asked

Martinez-Medina several questions in English. Stanley's questions were not complex, that is, questions about Martinez-Medina's residence, his job, the ownership of the vehicles, the identity of the men who had run and the fact that he, Martinez-Medina, had told the men not to run the prior day when they saw Stanley's unit. Stanley's conversation with Martinez-Medina lasted about five minutes. Martinez-Medina answered Stanley's questions simply and briefly, with his longest answer being "maybe a sentence or two."

Stanley testified that at no time did Martinez-Medina appear not to understand what was asked of him in English. Martinez-Medina never requested a clarification or that a question be repeated. All of the responses of Martinez-Medina to Stanley were in English and were appropriate responses to the questions asked. While Stanley spoke to Martinez-Medina in English, when he spoke to Fajardo, or spoke to both men jointly, he spoke in Spanish.

Stanley testified that when he initially went in pursuit of the pickup truck, he called for assistance. When help arrived, deputy sheriffs, other Border Patrol agents and agents of Immigration and Customs Enforcement (ICE), a search was commenced of the woods near the work site. This search yielded six men who were found to be illegal aliens. Stanley estimated that approximately twelve men initially fled the scene at his arrival.

One of the agents who responded to Stanley's call for assistance was ICE Special Agent James Holdman (Holdman), who is assigned to investigate work site enforcement. When Holdman learned that illegal aliens had been located, he began to question

Martinez-Medina. Holdman speaks no Spanish, so his conversation with Martinez-Medina was conducted in English. Stanley, who knew that Holdman did not speak Spanish, heard Martinez-Medina and Holdman speaking to each other in English.

Holdman asked Martinez-Medina general questions relating to his identity, who owned the job site and the identity of the contractor. This conversation occurred in English. When Holdman began to question Fajardo, Holdman realized that Fajardo did not speak English as well as did Martinez-Medina; Martinez-Medina served as a translator for the Holdman-Fajardo interview

Holdman testified that he decided to take a sworn statement from Martinez-Medina because it appeared that Martinez-Medina knew that at least some of the men working for him were illegally in the country. Stanley asked Holdman, in the presence of Martinez-Medina, if he needed translation assistance; Holdman said that he did not need any help because Martinez-Medina spoke English.

When Holdman's questioning of Martinez-Medina became more "pointed", Holdman gave Martinez-Medina his *Miranda* rights orally, and also gave him a printed *Miranda* form (in English) to read. Martinez-Medina said that he understood his rights and then signed the waiver form. Holdman then proceeded to the ICE office to take the sworn statement which is the subject of this motion.

When they arrived at the ICE office, Holdman was joined by Senior Special Agent John Thomas. Thomas again orally informed Martinez-Medina of his *Miranda* rights and

asked Martinez-Medina if he understood the rights. After Martinez-Medina confirmed that he did understand, Thomas signed the *Miranda* form which had been previously signed by Holdman and Martinez-Medina. A copy of the *Miranda* waiver form was introduced at the hearing.[1] [2]

      Holdman then took the sworn statement from Martinez-Medina. The statement was not recorded. Martinez-Medina was told that if he did not understand a question, it would be explained to him and that if he needed a translator, one would be provided. The procedure used to take the statement was as follows: Holdman sat at his computer; he asked Martinez-Medina a question in English which he, Holdman, typed out; Martinez-Medina answered the question in English; Martinez-Medina's *verbatim* answer was transcribed by Holdman; after the statement was completed, it was given to Martinez-Medina; Holdman told Martinez-Medina to read the statement over, and that if he had any questions, to tell Holdman; Martinez-Medina was also told that if he wanted to change the

---

[1] ICE has a *Miranda* rights waiver form in Spanish that was not used.

[2] The *Miranda* form reads as follows:

> Before we ask you any questions, it is my duty to inform you of your rights.
>
> You have the right to remain silent.
>
> Anything you say can be used against you in court, or other proceedings.
>
> You have the right to consult an attorney before making any statement or answering any questions.
>
> You have the right to have an attorney present with you during questioning.
>
> If you cannot afford an attorney, one will be appointed for you before any questioning, if you wish.
>
> If you decide to answer questions now, you still have the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting an attorney.

wording of any answer, Holdman would do so.

Martinez-Medina took the form, appeared to read it, made no requested changes, did not indicate any trouble understanding the statement, then signed the last page and, at Holdman's instruction, initialed the other pages indicating his agreement with the content.

The defendant's wife, Martha Alicia Martinez, testified that she and the defendant have been married for seven years and live in Pasadena, Texas. She testified that her husband came to the United States in 1994, and speaks "a few basic words" of English, but is not fluent. She testified that he often does not understand English conversation between her and her son (from a prior marriage), and asks that the conversation be conducted in Spanish. She testified that her husband has been in the construction business for about eight years. She further testified that he is able to read blue prints because the words are simple and because the blueprints are mostly numbers. She also testified that whenever they go out together, she translates for him.

Martha Martinez testified that at he time of this incident, she was in the hospital in Texas and that the defendant was very worried about her. She characterized Martinez-Medina as always "real nervous – always a nervous person." Finally, Martha Martinez testified that her husband was from rural Mexico, only completed the sixth grade in school and cannot read or write in either Spanish or English.

## LAW AND ANALYSIS

Custodial interrogations are inherently coercive.[3] To counter the inherently coercive nature of custodial interrogation, under *Miranda,* "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *United States v. Cardenas*, 410 F.3d 287, 292 (5th Cir. 2005). There is no talismanic incantation of phrases required to satisfy the strictures of *Miranda*. Nevertheless, the *Miranda* safeguards are "most commonly satisfied by giving the defendant the customary *Miranda* warnings: That he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that an attorney will be provided for him if he cannot afford to hire one."*Id.*

When the defendant challenges the voluntariness of a confession, the government must prove its voluntariness by a preponderance of the evidence in order for the confession to be admissible. *United States v. Reynolds*, 367 F.3d 294, 297-298 (5th Cir. 2004).

A defendant's waiver of his *Miranda* rights is effective only if voluntary. The inquiry whether a valid waiver has occurred "has two distinct dimensions. First, the

---

[3]For purposes of this Report and Recommendation it is assumed that the interrogation which resulted in the sworn statement was custodial.

relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Cardenas*, 410 F.3d at 292-93.

The voluntariness determination is made on a case-by-case basis and is viewed under the totality of the circumstances surrounding the interrogation. A crucial aspect is the presence or absence of coercive behavior on the part of the government. "[t]he [sic] voluntariness of a waiver of [*Miranda* rights] has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." (internal citation omitted) *Id.* at 293.

From the above facts, it is clear that no police "overreaching" occurred here. Indeed, the defendant does not contend that there was any coercion used to obtain the statement. Rather, the defendant claims that he was given his *Miranda* rights in English, a language which he does not understand, and that since he did not understand what he was told, that he did not make a knowing waiver of the right against self-incrimination. Defendant's Memorandum in Support, p. 2.

Thus, the sole question here is whether or not the defendant understood his *Miranda* rights when he waived them.[4] I conclude that the government has shown by a preponderance of the evidence that he did.

The defendant has been in the United States for approximately thirteen years. He was able to converse, in English, with Stanley, Holdman and Thomas. He was the foreman of the construction crew and therefore was able to read (at least well enough to continue to be employed for seven to eight years) construction plans and blueprints. Martinez-Medina never indicated to anyone involved that he did not understand what was being asked him, nor that he did not understand the rights which he was given. In fact, Martinez-Medina told the agents at least three times that he understood his rights.

There was no evidence produced by the defendant to refute the direct testimony of the government agents. While the defendant's wife testified that he was basically illiterate, there was no testimony to the effect that the defendant did not understand the words which he was read by the agents. The defendant's wife testified that the defendant's English vocabulary was very limited, but a review of the *Miranda* form shows that simple English words were used; the form does not use complicated legal terms to explain the rights afforded the defendant. Words like "right", "silence", "attorney" and "court" do not require a detailed English vocabulary to understand. These

---

[4]The defendant also denies that he, *in fact*, made the statements attributed to him by Holdman in the sworn statement. The *accuracy* of the statement, as opposed to the *voluntariness* of the statement, is beyond the scope of this Report and Recommendation and is therefore not decided hereby. This issue seems, to the undersigned, to be one of fact, that is, whether or not Martinez-Medina's answers were correctly transcribed. Questions of fact are, of course, jury questions.

words, and the similar words used in the form, are readily understandable to anyone with enough fluency in English to converse with the agents, serve as an interpreter for the agents and be a foreman on a residential construction job. The fact that the defendant may not be able to read English is unavailing to him since the agents gave him his rights orally at least three times before the statement was taken.

Finally, there is no evidence in this record that, in fact, the defendant did not understand his *Miranda* rights. The defendant did not testify at the hearing. His wife did testify, but she did **not** testify that Martinez-Medina's English was so limited that he did not understand the import and meaning of the simple words of the *Miranda* warning. Thus, considering the totality of the evidence adduced at the hearing, I find that the government has met it's burden and I therefore recommend that the Motion to Suppress be **denied**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within ten (10) days after being served with a copy of any objections or response to the District Judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of its service, or within the time frame authorized by**

**Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.** *See Douglass v. United Services Automobile Association*, **79 F.3d 1415 (5th Cir. 1996)**.

Lafayette, Louisiana, May 29, 2007.

*/s/ C. Michael Hill*<br>
C. MICHAEL HILL<br>
UNITED STATES MAGISTRATE JUDGE